CASE 22—PETITION EQUITY—APRIL 17.

# McGuire v. McGuire, &c.

### APPEAL FROM THE OWSLEY CIRCUIT COURT.

1. PROMISE TO DEVISE AN ESTATE TO ANOTHER.—Where there is an absolute promise, upon a valuable consideration by one party, to bequeath or devise to another a certain and definite legacy or estate, compensation may be recovered for a breach of the contract or agreement. (3 Bush, 35; 5 Bush, 625; 6 Bush, 235.)

   *The case decided.*—A father and son mutually agreed to and did make wills, the son devising his estate equally to his brothers and sisters, after a life estate to the father and mother, and the father, in consideration thereof, devising his entire estate to his daughters, in order to make them equal with the sons, to whom he had made advancements. After the death of the son and the probate of his will the father, contrary to the agreement, conveyed the greater portion of his estate to one of his surviving sons, who had a great influence over him, and who had already received large advancements, and published another will, revoking the former and devising to his daughters all his estate *which he should own at his death.* In a suit by the daughters to set aside these conveyances to the son it was held that they were entitled to recover. *The conveyances are set aside.*

2. See the opinion for the facts evidencing an undue influence over the mind of the testator.

W.M. PRESTON, . . . . . . . . . . For Appellant,

#### CITED

Civil Code, sections 20–28.
Revised Statutes, 2 Stanton, pp. 466, 695.
Cooper's Equity, 125, 268.
Ambler, 761.          1 Vernon, 42.
Swinburne on Wills, part 7, sec. 14.
5 Littell, 275, Well's will.
8 Bush, 364, Mitchell v. Holder.
2 Atkyns, 324, Bennett v. Vade.
1 Story's Equity, sections 184, 786.

2 Story's Equity, sections 1075, 1083.

2 How. 645, Gaines v. Chew.

3 Brown's Par. Cases, 358, Kerrick v. Brausley.

5 Beavan, 469, Allen v. McPherson.

1 House of Lords Ca. 218.

1 Dana, 203, Gore v. Stevens.

2 Maddock's Chancery, '48–60.

1 Jarman on Wills, 374.

1 Williams on Executors, 10.

2 Williams on Executors, 1236, 1237.

7 Dana, 5, Clay v. Hart.

1 Desaussure, 120.        3 Vesey, 410–420.

1 Bibb, 203, Grant v. Craigmiles.

1 Brad. Sur. Rep. 478.

10 B. Mon. 473, Tibbatts v. Berry.

18 B. Mon. 259, Hughey v. Sidwell's heirs.

50 N. Y. 91, Fred Deitz's will.

C. F. BURNAM, ⎫
H. C. LILLY,  ⎬  . . . . . . . . . .  For Appellees,

CITED

Hill on Trustees, pp. 150, 151.

Newland on Contracts, p. 111.

2 Vernon, 700, Grose v. Tracy.

1 Vernon, 296.

1 Story's Equity, p. 421, ch. 256, 296; 2 *Ib.* sec. 1265.

2 Marsh. 191, Gaines v. Gaines.

1 Watts, 163.        3 Vesey, 152.

2 Vernon, 506, Oldham v. Litchfield.

6 Bush, 237, Myles v. Myles.

5 Bush, 625, Smith v. Smith.

3 Bush, 35, Mason v. Mason.

CHIEF JUSTICE PETERS DELIVERED THE OPINION OF THE COURT.

Felix McGuire, a bachelor, over sixty years of age, prostrate with a disease which he knew would soon terminate his life, and the owner of a valuable farm, determined to dispose of his estate by a last will and to devise to his father and mother, who were very old, and who lived with him, a life estate in his farm; remainder to his sisters, there being four of them; and to pretermit his two brothers, James and John McGuire.

A few days before he died his brothers and sisters, father

and mother, being at his house, he informed them of the manner he intended to dispose of his property. The intended disposition did not suit his father, and was very distasteful to his brother James, and his father seems to have interposed to get him to change his purpose and to divide the remainder after the death of himself and wife equally between his brothers and sisters; but Felix appeared immovably to adhere to his expressed purpose, declaring that it was but justice to his sisters, because his father had, by advancing to his sons, provided liberally for them, while he had given but little to his daughters, perhaps to some of them nothing.

James and his father were frequently together in private consultation, and occasionally the old gentleman would converse with Felix on the subject of his will; but neither the persuasions nor arguments of his father could induce him to change his purpose of making his sisters the beneficiaries under his will after the death of his parents.

John McGuire proves that for several days before Felix made his will a dispute had been going on between his brother James and his sisters about whether the witness and James should have any part of the estate of their brother Felix, and how his will and the will of their father should be made; that on the day the will was made his father and brother James were out-doors talking to themselves, and one of them said to him that they had been trying to fix up and agree how the estates of Felix and his father should be divided, and how the wills should be made. They said to him that if Felix would will his estate equally between his brothers and sisters, and their father would will his estate to his daughters, giving to each of them an equal share, that that would make it right between all the parties. He replied, that arrangement would be satisfactory "and settle the fuss between them;" that they then went into the house, and his father said that he (the witness) or James could name it to Felix and the sisters and see if they would agree to

it. It was named to them all, and Felix said if his father would do that it would be all right. Their father then said to Felix, "Did you ever know me to make a contract or agreement that I did not stand to?" Felix replied, "No, he never did;" and thereupon a man was sent for to write the wills.

Robert B. Jameson proves he was sent for to go to the residence of Felix McGuire the day his will was written and published, and went there with Fulkerson, who wrote the wills; that old man McGuire met them at the fence, where they got off their horses, and told them that he and Felix wanted to make their wills; that he had got Felix to agree to will his estate to his brothers and sisters equally on condition that he (the old gentleman) would make his will *first* and give all his estate to his daughters, as he had never given them any thing. They then went into the house, and Fulkerson wrote the old man's will first; it was signed and acknowledged in the presence of Felix and all his other children. Immediately afterward Felix's will was written, signed, acknowledged, and delivered; that he and John Baker (who is dead) were subscribing witnesses to both wills, and were present all the time of the making and reading of them, and there was then some talk about the estimate and value of the estate of James McGuire, sr.

John McGuire also proved that on the day the wills were made some estimate was made of the estate of his father, and it was valued at "*five, six,*" or seven thousand dollars; that Felix had no other estate known to him, except the farm, which was then worth from eight to ten thousand dollars.

The two wills referred to were published on the 19th of May, 1860, and in three days thereafter Felix McGuire died, as Mrs. Lucas proves, and his will was afterward probated in the proper court, and under it James McGuire took one sixth of his estate after the death of his father and mother.

James McGuire, sr., survived his son Felix eight years or

more, although he was at the time of the death of Felix near or quite ninety years of age, and on the 24th of April, 1861, he conveyed to his son, James McGuire, a valuable tract of land on the middle fork of the Kentucky River, described by metes and bounds, for the following consideration, as recited in the deed, that said James McGuire, jr., "hereby binds himself to pay for two undivided shares of a tract of land of nine hundred and eighty-six acres, known as the Ambrose Burnett tract, lying and being in the county aforesaid, on the middle fork of the Kentucky River, which obligation to pay for said two shares of land is hereby acknowledged as the receipt for the payment to the party of the first part for the following described boundary of land," etc.

On the 15th of December, 1862, he conveyed to James G. McGuire, a son of the said James McGuire, jr., a tract of land on the middle fork of the Kentucky River, by metes and bounds, for the consideration of $200 paid down, and $200 evidenced by a promissory note due two years from date, as expressed in the deed; he also conveyed to his son James a tract of mountain land. These lands he owned on the 19th of May, 1860, when he published his will of that date, and after said conveyances he never owned any other lands, except the estate he took in the land of Felix under his will.

On the 27th of May, 1861, James McGuire, sr., published another paper as his last will and testament, whereby he revoked the will which, as he expressed it, was made and witnessed on the 19th of May, 1860, and after directing his debts to be paid he bequeathed his household and kitchen furniture to his wife during her life, and at her death to his four daughters equally. He then devised to his four daughters all the land he then owned or might thereafter acquire and *own at his death;* also all the cattle, horses, hogs, sheep, cash, cash notes, and accounts, which he should own or have possession of at his death, to be equally divided between them; and as a reason for

making his daughters the recipients of his bounty under the last will, he said he had theretofore given and conveyed to each of his three sons a large and valuable tract of land, which he considered equivalent to what he had willed that day to his daughters, and then appointed his son James and his friend Wm. M. Fulkerson his executors.

That instrument was offered for probate to the Owsley County Court as the last will and testament of Jas. McGuire, sr., deceased, and was in the office of the clerk awaiting the action of the court, as said clerk certified on the 4th of January, 1869; and if it has since that date been probated, there is no evidence of it in the record.

In November, 1869, Mrs. Jane McGuire, Mrs. Patsey Akers, and Mrs. Precilla Dunaway, surviving daughters of James McGuire, deceased, and their husbands, and the heirs of Mrs. Margaret Snowden, deceased, the other daughter of said James McGuire, sr., deceased, and who died after her father, brought this suit in equity against James McGuire, making John McGuire a defendant, to set aside the conveyances made by his father to him after the 19th of May, 1860, and the conveyance made to James G. McGuire, who was the son of appellant, and who subsequently died childless and intestate, and through whom Jas. McGuire, his father, claims the land by inheritance.

The court below granted the relief sought in the petition, and from that judgment James McGuire has appealed.

The facts herein stated are substantially alleged in the petition, and in addition thereto it is alleged that appellant was the active agent in bringing about the agreement between their father and brother Felix to make and publish their wills of the 19th of May, 1860; that he thoroughly understood the objects and purposes of the parties, and knew that Felix McGuire was induced to change his purpose of giving the whole of his estate to his sisters in consideration that their father would give all the estate he then owned to them, and that appellant

concurred in the arrangement and promised to aid in carrying it out. That soon after the death of Felix McGuire, and immediately after the probate of his will, appellant commenced a plan of operations to defeat the family settlements made by their father and brother, to cheat and defraud his sisters and his brother John out of their just rights, and to obtain the whole estate, real, personal, and mixed, of his father, and to hold on to the portion devised to him by his brother, Felix McGuire, well knowing that he had from time to time gotten large amounts of his father's money and lands, much more than his share, and to effectuate his fraudulent purpose importuned and by fraud and undue influence procured his aged father to give him large sums of money, cash notes, and other personalty, and to convey to him two tracts of land, one of the value of $2,000, and the other of the value of $1,000, and particularly described. They also allege that he by fraud and undue influence procured his father to convey to his son, Jas. G. McGuire, a young and unmarried man, a tract of land of the value of $2,000; that said James G. McGuire has departed this life intestate and childless since the conveyance of said land to him, and that appellant claims it as his heir. That James McGuire, sr., was the owner of said lands at the time he made his will of the 19th of May, 1860, and they would have passed by said will to his four daughters according to the contract and agreement with Felix McGuire, whereby appellant got one sixth of that estate; and that said testator devised to him said one sixth in consideration that his father would give to appellees the whole of the estate he then owned, and which he contracted and promised to do. That by like fraudulent importunity and undue influence said Jas. McGuire, jr., prevailed upon and procured his father to revoke the will made by him on the 19th of May, 1860, by agreement with his son Felix, and to make another will by which he devised to his daughters the estate he might own at the time of his death; the

said James McGuire, by his fraud and undue influence, having gotten all his land and a large portion of his personal estate without paying any thing for the real or personal estate conveyed and given to him by his father; and that after his father's death appellant administered upon his estate, and has not probated either paper purporting to be his will.

They repeat the allegation that appellant paid his father nothing for said lands, and that he procured large sums of money from him. They pray that the conveyances made subsequent to the 19th of May, 1860, be canceled, and the lands be surrendered up to them; that he be ordered to settle and pay over to them the money and effects which he received from his father after said date; and that he be made to account for the rent of the land; and for all proper relief.

Appellant admits in his answer that his brother Felix, when he published his will, was over sixty years of age; that his father was near ninety years of age and his mother a very old woman; but says his father and brother had mind and capacity to control and manage their estates and to dispose of them by last will and testament, or otherwise, understandingly and in a binding manner; that they might have been anxious to make a final disposition of their respective estates, *but he does not know,* nor does he know any thing of their desiring to consult each other in regard to the disposition of their estates. And he denies that he had any knowledge of any agreement or arrangement or contract between Felix and his father by which Felix changed his real purpose of devising his estate to his four sisters, and devised it to his four sisters and brothers in consideration of the promise and agreement of his father to devise his estate to the four girls; admits his brother devised his estate to his brothers and sisters in equal shares; and emphatically denies that any such agreement was made between his father and brother. He denies that his father had advanced more to his two sons than to his daughters, or

that that was the reason why Felix McGuire intended to devise his estate to his sisters, and denies that Felix ever intended to devise his estate to his sisters and cut his brothers out. He denies that there was any agreement between his brother and father that his father was first to make, sign, and execute his will and show it to Felix, and not change it thereafter, or that such agreement formed any part of the consideration for which Felix made his will as it was made, or that he had any knowledge of any such agreement between them.

And he then *denies positively* and says that it is *utterly false* that he was the active man in procuring the wills to be made on the 19th of May, 1860. And in responding to the paragraph of the petition beginning with the words "that after the death of *Felix*," etc., and ending with the words "knowing that he was cheating and defrauding his sisters out of their just rights," he groups all the material allegations contained in the paragraphs together and denies them in the aggregate, but in terms which might not be inconsistent with the truth of one or more of said allegations. For example, he denies that *soon after* the death of his brother Felix and the recording of his will he set about trying to defeat the intentions of his brother and his infirm old father, and to cheat and defraud his sisters and brother John out of their rights, and to obtain *the whole* estate, *real, personal,* and *mixed,* of his father. Now this may be a denial *only* that he set about to do the things charged *soon* after the death of his brother, and yet he may have set about it a year after his death. Again, he may have set about, by fraudulent and undue means, to procure and to secure a part of his father's estate to himself—viz., the real estate only, or the real estate and a part only of his personal estate, and no part of his mixed estate; and to that extent the answer would not be inconsistent with the truth.

In the same paragraph it is alleged that appellant fraudu-

lently and illegally procured his old father to give to him large sums of money—cash, and cash notes, and personalty—and to sell and convey to him the chief part of his estate, and to deed to him two tracts of land, one of them worth $2,000 or near it, and the other worth $1,000. In answer to that paragraph appellant groups all the facts together and denies them in the aggregate; when if he did, by fraud and undue influence, procure his father to convey the land to him, but did not thus procure him to give him large sums of money—cash, and cash notes, and personalty—or any or either of them, the denial would not be wholly inconsistent with the truth.

Other examples might be presented, but those given will suffice to show the insufficiency of the denials to material parts of the answer quoted; and as the important facts alleged are not controverted, they should be taken as true.

As to the consideration for the two tracts of land conveyed to him by his father, he says he conveyed them to him for a good, valuable, and valid consideration; that his father had the right to convey said lands to him, and the deeds invested him with the legal title. We find but one of the deeds referred to copied in the record, and the consideration has already been stated, which is that appellant had bound himself to pay for two undivided shares of a tract of nine hundred and eighty-six acres of land known as the Ambrose Burnett tract, etc. For whom was he to pay for said two undivided shares of land? He does not stipulate that he is to pay for them for his father; if he pays for them and takes the title to himself, his covenant will be performed. There is therefore no evidence of any consideration for the first conveyance. Nor does he state or prove that he paid any consideration for the second. He took the title to both tracts of land as a mere volunteer, with full knowledge of the prior equity of appellees, founded on a valuable consideration, and of which he was largely the recipient, and by a family arrangement which he actively aided

to bring about, as is conclusively established by the proof, notwithstanding the denial in his answer.

It can not be doubted from the evidence in this case that Felix McGuire intended to devise to his four sisters his estate, consisting principally of a valuable farm; that he was induced to change his purpose and to give his brothers, the appellant and John McGuire, each an equal share with his four sisters, in consideration that his father, then and there being possessed of a considerable estate, promised and agreed at his death to give to the sisters of testator all the estate that he then had, and made and published his will, which was read to Felix, whereby he did devise and bequeath to the sisters of Felix the whole of his estate; that at the time Felix made his will he was so very ill as to render it most improbable that he would ever revoke or change it; that he died in three days thereafter, leaving his will unchanged, whereby appellant got one sixth of his estate.

It has been held by this court that where there is an absolute promise, upon a valuable consideration, by one party, to bequeath or devise to another a certain and definite legacy or estate, compensation may be recovered for a breach of the contract or agreement. (Mason v. Mason, 3 Bush, 35; Smith v. Smith, 5 Bush, 625; Myles, ex'r v. Myles, 6 Bush, 237; Redfield on the Law of Wills, part 2, pp. 281–2.)

But it is alleged that the deeds were procured to be made by the fraud and undue influence exercised by appellant over his father. At the date of these conveyances the grantor was over ninety years of age; and while the witnesses prove that he was a man of as much or more intellect than any man they ever saw of his age, and that he had mental capacity to make prudent contracts and to manage his affairs, still it is in evidence that appellant lived near him, was at his house nearly as much as he was at his own home, that he was assiduous in his attentions to him, and that his influence over him was very

considerable; that he was able generally to get whatever he wanted from his father. While, however, these facts of themselves might not authorize the setting aside the deeds, there is one feature of the case which in connection with them must have great weight in its determination.

When the proposition was made to Felix McGuire to change his purpose of giving all his estate to his sisters, and to give an equal share to his brothers James and John, and was told that his father would give *all his estate* to his sisters, he replied that would do if his father would stick to it, thereby implying his doubts whether his father would carry out the agreement. The old gentleman, after saying he would, appealed to his dying son and asked him *if he ever knew him to make a contract or agreement that he did not stand to, and Felix replied, "No, he never did;"* and then the persons were sent for, and the wills were written and published.

The venerable father had made his life, before his son then over sixty years old, conspicuous for integrity and a faithful performance of all his engagements, and in that trying last hour, when his son's interrogatory implied a doubt, he appealed to that spotless integrity which had distinguished his pilgrimage of ninety years as the best guaranty he could offer for the faithful performance of the last promise he would ever be called on to make to that son, and to that the son yielded.

Confronted by these facts, it would be a thing incredible that the venerable James McGuire could be induced to repudiate a contract and violate a promise made with his son under the solemn surroundings attending that transaction, unless he had, under the weight of years, yielded to an undue and improper influence exercised over him by appellant, which he was unable to resist; and the deeds to James McGuire were therefore properly set aside by the court below. (Cruise v. Christopher's adm'r, 5 Dana, 181; James *et al.* v. Langdon, 7 Ben. Mon. 193; Gore v. Sumersall and wife, 5 Mon. 505.)

The appellees, as heirs of James McGuire, have a right to maintain this suit to set aside the deeds; and whether they may hold the estates as devisees or as heirs of their father may depend upon future developments—questions which we can not now decide, as neither will has been probated.

As to the deed made to James G. McGuire, we conclude that its execution was procured by the undue influence of his father, James McGuire, jr., and that deed was properly set aside.

Judgment affirmed.